**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1) MADAME HABYARIMANA; | ) | |
| in her own capacity and on behalf of the estate of the | ) | |
| deceased President of Rwanda, | ) | |
| JUVÉNAL HABYARIMANA; | ) | |
| | ) | Case No. CIV-10-437-W |
| 2) MADAME NTARYAMIRA; | ) | |
| in her own capacity and on behalf of the estate, of the | ) | |
| deceased President of Burundi, | ) | |
| CYPRIEN NTARYAMIRA; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| 1) PAUL KAGAME, President of the Republic | ) | |
| of Rwanda, | ) | |
| | ) | |
| Defendant, | ) | |

**COMPLAINT WITH JURY DEMAND**

**(WRONGFUL DEATH AND MURDER; CRIMES AGAINST HUMANITY; VIOLATION OF THE RIGHTS OF LIFE, LIBERTY, AND SECURITY; ASSAULT AND BATTERY; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT; TORTURE; AND CONTINUING CONSPIRACY IN FURTHERANCE THEREOF)**

**JURISDICTION**

1.    The Alien Tort Claims Act, 28 U.S.C. § 1350, provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." This Court also has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question jurisdiction) and §1332

(supplemental jurisdiction);18 U.S.C. §1332 and 18 U.S.C. §1964(c) (Racketeer Influenced and Corrupt Organizations Act).

2.      Further, the U.S. Federal Extraterritorial Torture Statute, 18 U.S.C.A. § 2340A, provides federal jurisdiction over "whoever outside the United States commits or attempts to commit torture" or conspires to commit torture, if said person is a national of the United States or is present in the United States, irrespective of the nationality of the victim or alleged offender.

3.      In addition, Plaintiffs invoke the supplemental jurisdiction of this Court, 28 U.S.C. § 1367, over claims based upon laws of the State of Oklahoma arising from ongoing, substantial contacts between Oklahoma and Defendant Kagame and the Government of Rwanda, voluntarily initiated or engaged in by Defendant Kagame, including, but not limited to: (a) the Rwandan Presidential  Scholars Program at Oklahoma Christian University, personally established by Defendant Kagame in Oklahoma in 2006; (b) the continuing operation of said Rwandan Scholars program which now totals more than 60 Rwandan students; (c) the Rwandan Outreach & Community Foundation, staffed by Oklahoma Christian employees; (d) Rwandans4Water, an initiative of the Rwandan Presidential Scholars Program; (e) Peace Through Business-Rwanda, a partnership with the Oklahoma City-based Institute for the Empowerment of Women; and, (f) the presence of Defendant Kagame in the State of Oklahoma on or about  April 30, 2010 to be honored by Oklahoma Christian University, and on numerous other occasions.

## PRELIMINARY STATEMENT AND INTRODUCTION

4.      On April 6, 1994 at 8:25 p.m., the Falcon 50 jet of the President of the Republic

of Rwanda, registration number "9XR-NN", on its return from a summit meeting

in DAR- ES-SALAAM (Tanzania) as it was on approach to Kanombe

International Airport in KIGALI, Rwanda, was shot down by two surface-to-air

missiles; and

5.      All passengers perished in the explosion of the aircraft, including:

a.      Juvénal HABYARIMANA, Chief of State of Rwanda,

b.      Cyprien NTARYAMIRA, Chief of State of Burundi,

c.      Déogratias NSABIMANA, Chief of Staff of Rwandan Armed Forces

(R.A.F.),

d.      Elie SAGATWA, Colonel and Chief of the Military Cabinet of the

Rwandan president,

e.      Thaddée BAGARAGAZA, Major and executive officer in the 'maison

militaire' of the Rwandan president,

f.      Juvénal RENZAHO, foreign affairs adviser to the Rwandan president,

g.      Emmanuel AKINGENEYE, personal physician to the Rwandan president,

h.      Bernard CIZA, Minister of Planning in the government of Burundi,

i.      Cyriaque SIMBIZI, Communications Minister of Burundi,

And the members of the French flight crew:

j.      Jacky HERAUD, pilot,

k.      Jean-Pierre MINABERRY, co-pilot,

l.      Jean-Michel PERRINE, flight engineer,

6.      The final order to shoot down the President's plane was given by Defendant

KAGAME, himself, during a meeting held in Mulindi, Rwanda on or about March

31, 1994, with the planning and the operational phase being entrusted to Col.

James KABAREBE, who was specifically charged with the formation of a team

specialized in the use of surface-to-air missiles furnished by Uganda in a

conspiracy with members of the non-governmental Rwandan Patriotic Army

(herein after RPA).

7.      The material preparation, the organization and the intelligence necessary for the

execution of this plot were brought together with the direct assistance of officers

in the RPA non-governmental conspiracy:

a.      Charles KAYONGA, RPA Battalion Commander,

b.      Jackson NKURUNZIA, a.k.a. Jack NZIZA, Major,

c.      Col. Samuel KANYEMERA, a.k.a. Sam KAKA,

d.      Rose KABUYE, Major,

e.      Jacob TUMWINE, Major, assistant to Lt.-Col. Charles KAYONGA; and

8.      Second Lt. Franck NZIZA and Corporal Eric HAKIZAMANA, members of the

missile section, fired their SAM-16-type surface-to-air missiles at the President's

plane and destroyed it in flight; and

9.      Defendant KAGAME deliberately chose a *modus operandi* that, in the context of

the particular tension pervading both in Rwanda and Burundi between the Hutu

and Tutsi communities, could only bring about bloody reprisals against the Tutsi community, and which offered him a veneer of legitimacy for his renewal of hostilities and his seizing of State power in Rwanda by criminally violent means.

## **THE PLAINTIFFS**

10.     Madame HABYARIMANA brings this action individually, and as administrator of the estate of her husband, Juvénal HABYARIMANA, now deceased, who was a subject, citizen, and resident of Rwanda. Madame HABYARIMANA presently resides outside of the United States and is not a citizen of the United States.

11.     Madame NTARYAMIRA brings this action individually, and as administrator of the estate of her husband, Cyprien NTARYAMIRA, Chief of State of Burundi, now deceased. Madame NTARYAMIRA presently resides outside of the United States and is not a citizen of the United States.

## **THE DEFENDANT**

12.     Paul KAGAME, Commander-in-Chief of the non-governmental RPA and the current President of the Republic of Rwanda.

13.     Whenever and wherever reference is made to individuals who are not named as Defendant in this Complaint, but were employees/agents of Defendant Kagame, such individuals at all relevant times acted on behalf of the Defendant Kagame within the scope of their respective employments.

# STATEMENT OF FACTS[1]

### Planned Assassinations

14.    While there may be some dispute regarding the particulars of the long history of

conflict for political power in Rwanda and Burundi, between groups known as

"Hutu" and "Tutsi", there can be *no doubt* that the invasion of Rwandan territory

by Tutsi ex-patriot elements of the Ugandan army in October 1990 (a.k.a. the non-

governmental RPA), led by Defendant Paul Kagame, is the *first* cause of events

that led to massacres that occurred between April and July 1994[2] and has resulted

in more than seven million deaths in Central Africa since that time.

15.    After an initial conventional assault on October 1, 1990, the Kagame-led RPA

engaged in a planned strategy of "guerilla" warfare with the purpose of: (a)

destabilizing the Habyarimana government; (b) making use of the U.N. sponsored

Arusha negotiations and association with opposition political parties as a "cover"

for RPA war preparations; and (c) having achieved military superiority as early as

February 1993, seizing power by military force in a final assault initiated by the

assassination of President Habyarimana.[3] It is *this* plan that touched off the long-

predicted civilian killings known as the "Rwandan Genocide."

16.    The months of late 1993 and early 1994 include many examples of acts of

sabotage, assassinations and disorder carried out by the Kagame Army (RPA) for

---

1  Footnote references are to documents and/or testimony in the record in the Military-1 Trial at the International
Criminal Tribunal for Rwanda.
2  *See* testimony of witnesses, DH-90 and DH-91, who witnessed the Invasion in the Parish in which one of them
served; Experts Desouter, Strizek, Lugan.
3  See testimony of Ruzibiza, Serge Desouter, Lugan Strizek, Colonel Luc Marchal and Witness ALL-42

the purpose of destabilizing and discrediting the Habyarimana government. These acts included the killing of opposition political leaders and Tutsi civilians and to demonstrate that the current Rwandan government could no longer ensure security of the population and to create propaganda to discredit the Habyarimana government in the eyes of the international community[4]. This strategy went hand-in-hand with the military build-up for the "final assault," which was the *only* "plan" or "conspiracy" that included the killing of civilians. It was at this time, late November 1993, that U.S. Ambassador Flaten specifically warned then General Kagame and President Habyarimana that the party that resumed hostilities would be responsible for the predicted civilian casualties on the order of the recent massacres in Burundi.[5] In direct violation of this warning, then-General Kagame resumed hostilities by shooting down the plane carrying the two Hutu presidents.

17.    While elements of the Kagame RPA were committing acts of "terrorism" to destabilize and discredit the Habyarimana government in early 1994, its negotiators were actively engaged in blocking the implementation of the U.N.-sponsored peace agreement (Arusha Accords) and Kagame was already threatening war.[6]  By April 1, 1994, not only had the representatives of all interested governments agreed that the issues preventing implementation of the Arusha Accords had been resolved, but U.S. Ambassador David Rawson confirmed that it was the intransigence of the Kagame-led RPA that was

---

4   Testimony of Abdul Ruzibiza, 9 March 2006
5   Testimony of Flaten, 30 June, 1 July 2005
6   Exhibits DNT30, DNT103, DNT105, DNT174, DNT243, DNT253, DNT254, DNT256, and DNT262

preventing the implementation of the Arusha Accords.[7]

### Defendant Kagame Triggers the Predicted Civilian Massacres by Assassinating Two Presidents[8]

18.     The final plans to assassinate President Habyarimana were converted into specific

orders from Defendant Paul Kagame on March 31, 1994, which were put into

action on April 6, 1994. An assassination team of Kagame's RPA called "the

network" launched   Uganda-supplied Soviet missiles from Masaka hill at about

8:30 p.m. on April 6, 1994.[9]   Not only was this revealed before the ICTR   Trial

Chamber, but French Terrorist Judge Bruguière arrived at this conclusion based on

the testimony that he heard in hearings leading to the indictment issued in

November 2006.[10] Similar  findings were reached by Spanish investigating Judge

Merelles.[11] Further, all RPA commanders had been brought to Mulindi on April 4,

1994, in apparent preparation for the assault to seize power that Defendant

Kagame ordered on the night of April 6, 1994, shortly after he had received news

of the successful assassination attack.[12]

19.     The assassination certainly was an act of war, as well as a terrorist act, as well as a

violation of the cease-fire. The timing of the orders for the Kagame-led troops to

---

7  Exhibits DNT31, DNT32, DNT104, DNT121, DNT179. *See* CHRONOLOGICAL LISTING OF DOCUMENTARY
   EXHIBITS/TESTIMONY DESCRIBING THE EXPLANATION OF EVENTS DURING THE 1990-94 RWANDA WAR.

8  *See* CHRONOLOGICAL LISTING OF DOCUMENTARY EXHIBITS/TESTIMONY DESCRIBING THE EXPLANATION OF EVENTS
   DURING THE 1990-94 RWANDA WAR. Jan-April 6 Sections, *et seq*. Former U.S. Ambassador Flaten testified that he
   personally warned Kagame that, if HE started the war again, HE would be responsible for killings like those that
   had recently occurred in Burundi. Once Kagame resumed the war, the predicted killings followed apace. What
   was lacking was the military capability to stop them by current Rwandan Army (the FAR), and the lack of will to
   do so, on the part of Kagame's RPA because they were winning the War.

9  Id.

10 *See* Bruguiere Indictment of RPF Attached.

11 *See* Merelles Indictment of Paul Kagame and RPA attached.

12 *Id. See also* BRA-1 (T. 05/04/06, p. 64-67).

mount the final assault on the night of April 6, 1994 – and *not* the afternoon on April 7 – belies the assertion that Kagame's resumption of war was launched in response to the killing of his supporters.[13]

20.     In fact, Defendant Kagame and the RPA resumed the war, *without* any provocation, with the assassinations of Presidents Habyarimana and Ntaryamira. From the standpoint of fixing central responsibility for the massacres that the assassinations of Presidents Habyarimana and Ntayarmira touched off, these acts were undertaken with *full knowledge on the part of Kagame that resumption of the war would cause massive civilian casualties*, as U.S. Ambassador Flaten had warned some five months earlier and as predicted by the U.S. State Department.[14]

Continuing and Deepening the Predicted Bloodbath

21.     The responsibility of Defendant Kagame and the RPA for the massacres that the RPA assassination of Pres. Habyarimana touched off does not end with the inception of those killings. Defendant Kagame admitted to U.N. Gen. Dallaire on April 22, 1994, the predicted civilian massacres were an integral part of his war plan. In response to Dallaire's complaint that the RPA was not using its troops to save the predicted Tutsi victims of the renewed combat, Gen. Kagame said that, "There will be many sacrifices in this war. If the refugees have to be killed for the cause, they will be considered as having been part of the 'sacrifice' for his war

---

13 Testimony of Colonel Marchal (T. 30/11/06, p. 27-28); Lugan (T. 15/11/06, p. 9); Ruzibiza (T. 09/03/06, p. 26-28, 38-39). ALL42 (T. 09/11/06, p. 21).
14 *See* footnote 5.

plan.[15],,

22.     French Judge Bruguière and Spanish Judge Merelles noted that on numerous

        occasions, beginning on the night of April 6, 1994, the RPA and Defendant

        Kagame rejected cease-fire offers by the Rwandan General Army (RGF).[16]  Gen.

        Dallaire also noted in contemporary code cables that the RPA would not agree to a

        cease- fire while it was winning.[17]  The ICTR testimony of former RPA officer

        Joshua Ruzibiza, and a confidential witness, (BRA-1), recount specific examples

        of Defendant Kagame ordering his troops *not* to intervene to save civilians and

        removing officers from their command for attempting to do so.[18]  Judges

        Bruguière and Merelles found, and other witnesses testified, that the RPA

        affirmatively blocked the intervention of an international peace-keeping force

        intended to save Tutsi lives.[19]

23.     In addition to the *direct* responsibility of Defendant Kagame and the RPA for

        bringing the Rwanda civilian massacres about by assassinating Pres. Habyarimana

        and Ntaryamira and resuming the war, and for blocking the possibility of military

        intervention to stop the massacres once they began, Kagame and the RPA are

        also directly responsible for massacres committed in areas occupied by their

        forces, or where combat was occurring. As early as the night of April 6-7, 1994,

---

15  Testimony of Dallaire (T. 27/01/04. P. 87-88) and book (Exhibit DNT33) on page 358 (English) or 451 (French);
    Testimony of Reyntjens (T. 21/09/04, p. 49-50). When commenting on the Kagame statement, Reyntjens
    confirmed that other RPF leaders made the same statement (T. 21/09/04, p. 49-50). During his testimony,
    Ruzibiza corroborated Reyntjens (T. 09/03/06, p. 62)
16  Bruguiere Report; Testimony of witness Colonel Luc Marchal (T. 30/11/06, p. 25-26)
17  Exhibits DNS106, DNT111, DNT112, DNT113, DNT118, DNT188 and DNT189.
18  Testimony of Ruzibiza (T. 09/03/06, p. 45) and witness BRA-1 (T. 06/04/06, p. 68)
19  Bruguiere, p. 46; Testimony of witnesses Colonel Dewez (T. 24/06/05, p. 49); Desouter (T. 04/04/06, p. 19) and
    Colonel Luc Marchal (T. 30/11/06, p. 25-26).

squads were leaving RPA headquarters to kill persons, particularly in Remera

area, near the RPA headquarters. According to witnesses Prof. Reyntjens and U.N.

Colonel Luc Marchal, these were "political killings" of elites and leaders.[20]

24.     Defendant Kagame's RPA massacred thousands in the stadium in the northern city

of Byumba shortly after seizing control of the city on April 7, 1994.[21]  And, as the

main force of Kagame's RPA swept southward from Byumba/Mutara, it reached

the area around Kubungo/Rusomo in the southeast of Rwanda in the two weeks

after April 6.[22]

25.     As early as May 17, 1994, United Nations High Commissioner (UNHCR) for

Refugees reports show that thousands of civilians were systematically being

massacred by Defendant Kagame's RPA troops in areas around Rusomo and in the

eastern third of the country that had been controlled by the RPA since the third

week in April.[23] The RPA massacres in the eastern part of the country were

documented by Robert Gersony, U.S. State Department Human Rights

investigator, who reported  that in a few weeks he had concluded that no fewer

than 40,000 civilians had been killed by Kagame's RPA troops in a manner that

could only have occurred as military operations in a small part of Rwanda.[24]

---

20 Reyntjens Testimony (T. 22/09/04, p. 30) his book Rwanda, Trois jours qui ont fait basculer l'histoire, p. 62 and
   Testimony of witness Colonel Luc Marchal (T. 01/12/06, p. 1).
21 Testimony of witness BRA-1 on (T. 06/04/06, p. 64-65); witness ALL-42 (T. 08/11/06, p. 41-43)
22  For a summary of some of the crimes committed by Defendant Kagame and co-conspirators in the furtherance
   of the conspiracy, see summary prepared by Paul Rusesabagina, the main figure depicted in the award winning
   film, *Hotel Rwanda*, attached.
23  May 17 Code Cable. *See* CHRONOLOGICAL LISTING OF PROSECUTION AND OF DOCUMENTARY
   EXHIBITS/TESTIMONY DESCRIBING THE EXPLANATION OF EVENTS DURING THE 1990-94 RWANDA WAR. May Section.
24 Gersony Report (Exhibit DK-112) and related testimony be witness Jean Marie Vianney Ndagijimana former
   RPG Foreign Minister. (T. 16/11/06, p. 50-58).  *See* CHRONOLOGICAL LISTING OF PROSECUTION AND OF
   DOCUMENTARY EXHIBITS/TESTIMONY DESCRIBING THE EXPLANATION OF EVENTS DURING THE 1990-94 RWANDA

26.     Although it cannot be denied that many Rwandans, both Hutu and Tutsi were killed by opponents of the RPA, these killings were *not* as a result of a "pre-planned government led genocide" or "conspiracy.[25]"   Rather, like killings had occurred in Burundi in October 1993, as result of violence following the assassination of the first Hutu President, Mechiov Ndadaye. The killings in Rwanda began as a reaction to the assassination of the second and third Hutu presidents killed in the last six months. The Kagame RPA war of invasion, as predicted by U.S. Ambassador Flaten and many others, triggered massive civilian on civilian violence.[26]

27.     The *predicted* tragedy reached *unpredictable* proportions because the RPA military objectives required that the country descend into chaos, as part of its war plan, and that massacres of the population were considered merely *collateral damage* by Defendant Kagame.[27]   Both he and the RPA bear responsibility for their scope and extent, and the conspiracy to avoid responsibility for their own crimes that continue today.

## GENERAL ALLEGATIONS

28.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, and

---

WAR. September-October 1994 Sections, *et seq.*

25  *See* ICTR, Military-1 Judgment of February 8, 2009, acquitting top military officers who opposed Kagame's RPF of conspiracy on planning to commit genocide.

26  The CIA had predicted in January 1994 that in case of resumption of hostilities as many as half a million persons might die.  This information is found in the book of Des Forges "Leave none to tell the story" on page 18.

27  Cross examination testimony of Gen. Dallaire related to Code Cable of April 23, 1994, reporting his conversation with Kagame in Mulindi and report of the same in his book, from which the "collateral damage" languages is drawn.

extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

29.   Plaintiffs' causes of action arise under the following laws, agreements, conventions, resolutions and treaties:

a.   Alien Tort Claims Act, 28 U.S.C. § 1350;

b.   Torture, 18 U.S.C. § 2340A

c.   Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968;

d.   Customary international law;

e.   United Nations Charter, 59 Stat. 1031, #3 Bevans 1153 (1945);

f.   Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/81 0 (1948);

g.   International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

h.   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. Doc. A/39/51 (1984);

i.   Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/I0034 (1976);

j.   Common law of the United States of America;

k.      Statutes and common law of the State of Oklahoma, including but not

limited to wrongful death, assault and battery, intentional infliction of

emotional distress, fraud, and the;

l.      Laws of Rwanda.

30.    There is no independent functioning judiciary in Rwanda and any suit against

Defendant there would have been and would still be futile and would result in

serious reprisals.

## COUNT 1

### (Wrongful Death – Murder)

31.    On their own behalf and on behalf of their deceased relatives, Juvénal

Habyarimana and Cyprien Ntaryamira, Plaintiffs reallege and incorporate by

reference the allegations set forth in paragraphs 1 through 40 as is fully set forth

herein.

32.    As a direct result of the Defendant's acts and omissions and as a result of the death

of their respective husband, Plaintiffs have sustained pecuniary loss resulting from

the loss of society, comfort, attention, services, and support of each decedent.

33.    Paul Kagame is liable for said conduct in that Defendant directed, ordered,

confirmed, ratified, and/or conspired with the military regime in bringing about

the wrongful deaths of Juvénal Habyarimana, Cyprien Ntarymira, Déogratias

Nsabimana, Elie Sagatwa, Thaddée Bagaragaza, Juvénal Renzaho, Emmanuel

Akingeneye, Bernard Ciza, Cyriaque Simbizi, Jacky Heraud, Jean-Pierre

Minaberry, and Jean-Marc Perrine.

34.     The acts described herein constitute wrongful death, actionable under the laws of

Oklahoma, the United States, and Rwanda.

## **COUNT 2**

(Crimes Against Humanity)

35.     The allegations set forth in paragraphs 1 through 34 of this Complaint are

reY alleged and incorporated by reference as if fully set forth herein.

36.     The acts described herein against Plaintiffs constitute crimes against humanity, in

violation of customary international law which prohibits inhumane acts of a very

serious nature such as willful killing, torture and other inhumane acts committed

as part of a widespread or systematic attack against any civilian population.

Leaders, organizers, instigators and accomplices participating in the formulation

of these acts are responsible for all acts performed by any person in execution of

such plan.

37.     The acts described herein constitute crimes against humanity in violation of the

Alien Tort Claims Act, customary international law, the common law of the

United States, the statutes and common law of Oklahoma, the laws of Rwanda,

and the international treaties, agreements, conventions and resolutions described in

paragraph 39 herein.

38.     Defendant Paul Kagame is liable to Plaintiffs for said conduct in that Defendant

directed, ordered, confirmed, ratified, and/or conspired with the military regime in

bringing about the crimes against humanity committed against Plaintiffs.

## COUNT 3

(Violation of the Rights of Life,
Liberty and Security of Person)

39.     The allegations set forth in paragraphs 1 through 38 of this Complaint are

realleged and incorporated by reference as if fully set forth herein.

40.     The shooting down of President Habyarimana's plane constitutes violations of the

right to life, liberty and security of person of all those on the plane.

41.     The shooting down and killing of occupants of the plane constitutes violations of

the rights to life, liberty and security of person, for which Defendant Kagame is

liable.

42.     The acts described herein constitute violations of Plaintiffs' rights to life, liberty

and security of person in violation of the Alien Tort Claims Act, customary

international law, the common law of the United States, the statutes and common

law of Oklahoma, the laws of Rwanda, and the international treaties, agreements,

conventions and resolutions described in paragraph 29 herein.

43.     Defendant Paul Kagame is liable for said conduct in that Defendant directed,

ordered, confirmed, ratified, and/or conspired with the military regime in bringing

about the illegal violations of the rights to life, liberty and security of person.

## COUNT 4

(Assault and Battery)

44.     The allegations set forth in paragraphs 1 through 43 of this Complaint are

realleged and incorporated by reference as if fully set forth herein.

45.     As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony.

46.     Defendant's acts were willful, intentional, wanton, malicious and oppressive.

47.     Defendant Kagame is liable for said conduct in that Defendant directed, ordered, confirmed, ratified, and/or conspired with the military regime in bringing about the assault and battery of the occupants of the plane and tens of thousands of Rwandans.

48.     The acts described herein constitute assault and battery, actionable under the laws of Oklahoma, the United States and Rwanda.

## COUNT 5

(Intentional Infliction of Emotional Distress)

49.     The allegations set forth in paragraphs 1 through 48 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

50.     The acts described herein constitute outrageous conduct in violation of all normal standards of decency and were without privilege or justification.

51.     These outrageous acts were intentional and malicious and done for the purposes of causing Plaintiffs to suffer humiliation, mental anguish and extreme emotional and physical distress.

52.     As a result of Defendant's acts, Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

53.     Defendant is liable for said conduct in that Defendant directed, ordered, confirmed, ratified, and/or conspired with the military regime in bringing about

the intentional infliction of emotional distress of the occupants of the plane, the

relatives of the occupants and tens of thousands of Rwandans.

54.   Defendant's outrageous conduct constitutes the intentional infliction of emotional

distress and is actionable under the laws of Oklahoma, the United States and

Rwanda.

## COUNT 6

(Violations of the Racketeer Influenced and
Corrupt Organization Act)

55.   The allegations set forth in paragraphs 1 through 54 of this Complaint are

realleged and incorporated by reference as if fully set forth herein.

56.   From not later than 1990 to the present, Defendant Kagame and his agents and co-

conspirators formed a RICO "enterprise" within the meaning of 18 U.S.C.

§ 1961(4) engaged in foreign and interstate commerce.

57.   Alternatively, Defendant and his agents and co-conspirators constituted an

association in fact for a common purpose with a continuous existence separate and

apart from the pattern of racketeering activity in which they engaged. This

association in fact constituted an enterprise within the meaning of 18 U. S.C.

§ 1961(4).

58.   Defendant is an "individual or entity capable of holding a legal or beneficial

interest in property" and, as such, constitute a "person" within the meaning of 18

U.S.C. § 1961 (3).

59.   Defendant is engaged in interstate acts of commerce and the acts alleged herein

have a potential effect on commerce.

60.     Over a period of years and continuing to the present, Defendant with his co-
conspirators or agents, in violation of 18 U.S.C § 1962(b) through a pattern of
racketeering activity, have acquired and maintained an interest in resources in the
eastern Congo to their own benefit.[28]

61.     At all times relevant to this Complaint, the Defendant and his agents and co-
conspirators conducted, or participated directly or indirectly in the conduct of the
affairs of the enterprise through a pattern of racketeering activity, within the
meaning of 18 U.S.C. § 1961 (1)(5), in violation of 18 U.S.C. § 1962 (c).

62.     At all times relevant to this Complaint, the Defendant Kagame, *et al*, in violation
of 18 U.S.C. § 1962(d) combined and conspired together and with his agents and
co-conspirators to commit conduct the affairs of the enterprise through a pattern of
racketeering activity.

63.     In furtherance of the conspiracy, and to effect the objects thereof, the Defendant
committed overt acts as set forth more fully in paragraphs 1 through 65 and in the
attached indictments and ICTR Complaint.

64.     During 1990 through 2010, in violation of 18 U.S.C §§ 1962(c) and (d),
Defendant, with his agents and co-conspirators, conspired to and did conduct the
affairs of the enterprise through a pattern of racketeering activity.

65.     The pattern of racketeering activity alleged in paragraphs 1 through 64 above

---

28  See Expert Reports of 2001, 2002, 2003, 2008 commissioned by U.N. Security Council detailing ongoing theft
of billions of dollars of natural resources from the eastern Congo by Defendants.

included the following specific acts, all of which constituted and are defined as

racketeering activity by 18 U.S.C. § 1961(1) and all of which are set forth in the

specific numbered paragraphs herein which are realleged and incorporated here by

reference as if fully set forth, as follows:

a.    arson;

b.    murder;

c.    torture;

d.    extortion;

66.    Defendant's acts alleged herein have substantial effect within the United States.

67.    As a direct and proximate result of the Defendant's violations of 18 U.S.C.

§§ 1962 (b), (c) and (d) Plaintiffs have suffered injury to business, property,

reputation and livelihood.

68.    The injuries suffered by each Plaintiff were reasonably foreseeable or anticipated

by the Defendant as the natural consequence of Defendant's acts.

## <u>COUNT 7</u>

### (Torture)

69.    The allegations set forth in paragraphs 1 through 68 of this Complaint are

realleged and incorporated by reference as if fully set forth herein.

70.    Under 18 U.S. C. 2340A (a), whoever outside the United States commits or

attempts to commit torture is subject to criminal penalty of not more than 20 years,

or both, and if death results to any person from conduct prohibited by this

subsection, shall be punished by death or imprisoned for any term of years or for life. Such provision makes out a comparable claim for damages, arising from the tort associated with the aforesaid criminal act.

71.    In the moments immediately prior to their deaths, the decedents experienced psychological and physical discomfort amounting to torture, arising from their impending deaths and intentional and murderous acts of defendants Kagame *et al*.

72.    The federal courts of the United States have explicit criminal jurisdiction over the activity prohibited in subsection (a) if –the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender.

73.    Defendant Kagame has been present in the United States on numerous occasions and was present on April 30, 2010, within the forum State of Oklahoma.

74.    The injuries suffered by each Plaintiff were reasonably foreseeable or anticipated by the Defendant as the natural consequence of Defendant's acts.

## **COUNT 8**

### (Conspiracy to Torture)

75.    The allegations set forth in paragraphs 1 through 74 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

76.    Under 18 U.S.C. 2340 (c) –A person who conspires to commit torture, or attempts to commit torture, shall be subject to the same criminal penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy, thus establishing a similar cause of action in tort.

77.     Up to and including the moment the plane crashed, thus extinguishing the lives of

        decedents, Defendant Kagame, his agents and his co-conspirators were engaged in

        the conspiracy to murder, and torture, the occupants of the plane for which they

        had meticulously prepared.

78.     The injuries suffered by each Plaintiff were reasonably foreseeable or anticipated

        by the Defendant as the natural consequence of Defendant's acts.

79.     Since the deaths occurred, Defendant has been engaged in a conspiracy to "cover-

        up" and deny their culpability, along with un-named countries and co-conspirators.

## PRAYER FOR RELIEF

        WHEREFORE, Plaintiffs request the following relief:

80.     That this Court assume jurisdiction of this cause to determine this controversy and

        set this case for hearing on the merits;

81.     The award of compensatory damages to Plaintiffs in the amount of

        $250,000,000.00;

82.     The award of punitive damages against the Defendant in the amount of

        $100,000,000.00;

83.     That this Court allow the Plaintiffs costs, expenses and attorneys' fees, and also

        grant such alternative relief as may seem to the Court, just, proper, and equitable.

## JURY TRIAL DEMAND

        Plaintiffs demand a jury trial, pursuant to the Seventh Amendment to the

        Constitution of the United States, as to all claims for damages.

## PLACE OF TRIAL

Plaintiffs designate Oklahoma City, Oklahoma as the place of trial.


Dated:                                    Respectfully submitted,



                                          *s/ John P. Zelbst*
                                          John P. Zelbst, OBA # 9991
                                          Zelbst, Holmes & Butler
                                          P.O. Box 365
                                          Lawton, OK 73502-0365
                                          Tel: (580) 248-4844
                                          Fax: (580) 248-6916
                                          zelbst@zelbst.com
                                          Attorney for Plaintiffs

                                          Prof. Peter Erlinder[29]
                                          Director, International Humanitarian
                                          Law
                                           Institute
                                          Wm. Mitchell College of Law
                                          875 Summit Ave.
                                          St. Paul, MN 55105
                                          651-290-6384

                                          Kurt P. Kerns, KS Bar #15028
                                          Ariagno, Kerns, Mank and White,
                                          L.L.C.
                                          328 N. Main
                                          Wichita, KS 67202
                                          316-265-5511
                                          kurtpkerns@aol.com

---

29  Mr. Zelbst is a member of the Bar of this Court.  Mr. Erlinder is a member of the Bar of the State of Illinois and
    Indiana.  Mr. Kerns is a member of the Bar of the State of Kansas.  Mr. Erlinder and Mr. Kerns are not admitted
    in this Court at this time.

## <u>CERTIFICATE OF MAILING</u>

I hereby certify that on August 2, 2011, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a notice of electronic filing to the following ECF registrants:

W.A. Drew Edmondson                Email: dedmondson@gablelaw.com
Gablegotwals
One Leadership Square, Suite 1500
211 North Robinson
Oklahoma City, OK 73102-7101


Michael S. Cryan                Email: cryan.michael@arentfox.com
Robert C. O'Brien                Email: obrien.robert@arentfox.com
Pierre-Richard Prosper                Email: prosper.pierre@arentfox.com
Roy Z. Silva                Email: silva.roy@arentfox.com
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013

Attorneys for Defendant


                        *s/John P. Zelbst*
                        **JOHN P. ZELBST**